Good morning, Your Honor. May it please the Court, I'd ask for two minutes for rebuttal. My name is Albert Evans and I represent David Roth, the appellant in this matter. The Court on March 17th asked two questions to be addressed here. The first question was, what was the Department of Transportation's working understanding of the phrase, unloading incidental to movement, prior to its final rulemaking on October of 2003? And judges, the DOT defined unloading incidental to movement prior to October of 2003 to include any type of unloading. Even unloading by a consignee multiple days after a rail car had been delivered to the consignee's facility and was on its private property. So does that mean we have a significant change in the import of the regulations pre-2004 amendments and post-2004 amendments? Your Honor, the answer is it was couched in terms of clarification on multiple notices of proposed rulemaking. My recollection was that the DOT acknowledged at one point in the regulations that this constituted, quote, a significant change from current policy. Your Honor, I... How can a significant change be a matter of clarification? Your Honor, when I read, this is the final rulemaking dated October 30th of 2003, it says the RSPA is clarifying the applicability of the hazardous material regulations to certain functions, including unloading. I agree with the Court, Judge Smith, it was a change. It was a significant, it was a change that took out from the regulations the unloading by a consignee after the carrier had left the premises. It took that out of the coverage of the hazardous material regulations and the Hazardous Material Transportation Act. That rule did. But how realistic is it to assume that you can separate from the design requirements of these regulations, transport from what then goes on at a siding, don't those design regulations continue in effect and their import remain? Your Honor, can we artificially, that's a loaded question, but it seems to me we artificially attempt to separate the time and space of transport from the time and space of this tank car sitting on a siding or at a place of manufacture where it's unloaded. Your Honor, to address that question though, we have to look at what the preemption section says of the Hazardous Material Transportation Act. And it says the design related in the transportation of hazardous materials. This is what was in effect at the time of the injury of Mr. Ross now. Your Honor, I contend to the Court that the Court should take the definition that was enacted as the rule, the final rule on October 30th, 2003, because the Court as a final interpreter of the language needs to only give deference to the DOT definition if it is reasonable, Your Honor. And I believe that the DOT final rulemaking in October 30th of 2003, 10 months before Mr. Ross' tragic incident, specifically went into three definitive reasons as to why their prior definition of unloading incidental to movement, which was effective on Mr. Ross' day of the accident, was unreasonable. They clearly said in that final rule, 10 months before, the prior definition, even though not effective right away, is unreasonable. And they actually... They used the word unreasonable? Your Honor, they went... I submit to the Court... They used the word unreasonable? No, no they didn't, Your Honor. But they set forth three specific reasons. And the first reason, Judge, was that the old definition ignored the realities of modern-day shipping. It said ignored the realities of modern-day shipping. Do you have any textual source anywhere criticizing the rule that would be suggestive of unreasonableness? Based on how the rule read at the time of the accident? Because your argument seems to be that the fact of amendment, the fact of change, suggests prior unreasonableness. No, no, Your Honor, I respectfully disagree. My argument, Your Honor, is that when you look at the proposed notice of rulemaking, Your Honor, the notices leading up to the final rule, each one of them, Your Honor, by... Specifically identified major or significant problems with the old definition or the definition in effect. Specifically saying at one point, Judge, that it was contrary to congressional intent. If a rule is contrary to congressional intent and stated by the DOT to be contrary to congressional intent, I believe that this Court can make the judgment that a rule that is contrary to congressional intent is unreasonable. The entire rule or some portion of it? What was contrary to congressional intent? Contrary to congressional intent was the fact that the unloading... Congress said that it has to be unloading incidental to movement to be governed by the hazardous material regulations. And what the DOT said is, by us creating the definition, the DOT, that unloading, every type of unloading, is subject to the regulation, gives no... I'm sorry, Your Honor. Let me ask you a question. If we accept your position that your client's conduct is taken out of the regulations, what does that get you? You still have a product liability claim, don't you? I do, Your Honor. That is premised on a design defect? A design defect, yes, Your Honor, but as I said, the preemption clause, Your Honor... I understand that, but I want to get back around that. You're still arguing that there is a defect in this railroad tank car that involves the absence of a safety valve and a pressure gauge? Yes, specifically a valve, Your Honor. You still run into federal law that says that's not required? Your Honor, I respectfully contest the preemption. The presumption statute has to be interpreted narrowly, and it is only preempted if it's in transportation. The design in transportation... In response to Judge Fuentes' question, you can see that that requirement is not in the regulation, right? Your Honor... Your entire theory of liability is based upon an additional safety mechanism. No, Your Honor. If you look at the regulation related to valves, Your Honor... Is it required? It is... Or is what was on this tank car acceptable, explicitly so under the rule? It wasn't explicitly accepted, Your Honor, no. It was not an acceptable means under the regulations? It was approved by the AAR. However, Your Honor, the regulations under the hazardous material regulations do not govern when a valve should be used. It says under that specific section, 179-200-16, it says when circumstances warrant, a valve must... Can be placed on the rail car of an approved nature. But to prevail in your case, you have to show that there was a deficiency, there was a defect in design in not including a safety valve in the tank car, which would be a requirement that is inconsistent with the AAR's requirements, which is no safety gate. It wouldn't be consistent, Your Honor. It wouldn't be inconsistent. It wouldn't be inconsistent? I'm sorry. It wouldn't be inconsistent, no, because the regulations allow for a valve, the type of valve they specify, but they don't say when the valve could be used. They don't say in the regulations on class A cars or sulfuric acid cars, this is when the valve would be on. If that was the case, Your Honor, I would concede it's preempted, but there's no condition. There's nothing in the hazardous material regulations that say when a valve is to be used. That is solely left within... Your case is premised on the idea that there should be, there should be a valve when it's not, when it doesn't come within the regulations. But you're still, you're still saying that there should have been a valve present in the tank car. Yes, Your Honor. And you're saying that's not inconsistent with the AAR's recommendation? The AAR is approving, their approval is based on the regulations, the transportation. They approve the car for its movement and transportation, not for its unloading purposes, Your Honor. And they permit valves, the AAR permits valves on the tank cars. They don't say when they permit, it's when it's left to the discretion of the shipper outside of the hazardous material regulations, outside of what the AAR does. The shipper has a duty to its customers outside of this, outside of the hazardous material regulations to protect its customers that it's providing hazardous material to. Well, look, if this is true, then it's because state law requires it. And while federal law might permit it, it didn't require it. I mean, there's a distinction between permitting something and requiring it. So I mean, if in fact you can be hit with tort liability, that is required, obviously. So that the outcome of litigation on this would require the changing of all these cars. I wonder, too, how long it has to sit there before it's no longer unloading. Suppose a train pulls up, there's an engine that pulls a train up, and the cars are in, some guys rush over, start to unload it. Well, most people would say that's unloading, you can actually put transportation. How about one day, two days, three days, four days? Your Honor, the DOT addressed that in its rulemaking process. And it said, Your Honor, when the carrier, the rail company that drops off the container is still present, that is considered unloading. Sovereign, but in this case, Your Honor, the rail car was at the Constanese facility for an indeterminate amount of time, but definitely for at least a week or more than a week. It would only have to be there for a couple of minutes, then. It would only have to be there for a couple of minutes if it took off. If the carrier left, yes, Your Honor, under the hazardous material regulations, the way the DOT's final rule was in October of 2003, then it would not be governed by the hazardous material regulations. If the carrier left the facility, yes. Just to make explicit what I assume is an understanding here, and that is the section 5125 provision refers to a package container or packaging component. There's no dispute that the railway tank car here was such a package container or packaging component, right? We allege that it was a packaging. It was a package that was distributed to Mr. Roth and his employer. Yes, Your Honor. We do. Is it the case that when there's a federal requirement for federal regulation specifying for the provision of a safety device or no safety device, the regulation should say when? Your Honor, the preemption law, both based on Medtronic and Harkins within this Third Circuit, specifically said that if they don't say when, it's not preempted. Your Honor, if we remember at Harkins, it was the children's warnings. Because the allegations were adult warnings, not children's warnings, it was not preempted. In Medtronics, it was a pacemaker. Because the pacemaker did not specify the form, it was not preempted. In this case, what I said to you is they don't specify when the valve should be used. Thank you, Mr. Evans. We've got your argument. Thank you. We can hear you back on rebuttal. Ms. Bornstein. Thank you, Your Honor. Good morning. My name is Deborah Bornstein and I represent North Falco, which is the defendant and antele in this case. And I guess I would like to address the preemption issue first, and particularly the court's questions, because I do need to point out a couple of things. One, 61906 is approximately 60 pages of a regulation. And we think that, of course, the court should give considerations to the agency's interpretation. But I think that all of that... Consideration of deference. From deference. It's not binding on the court because this was a rulemaking procedure rather than an adjudicatory procedure, but certainly deference. And I think it's appropriate to read all of what the agency said. So later on in the same order, in 61906, at page 61918, the agency is addressing comments that were made respecting the proposed rule. And there was a comment that if the HMR would not be applicable to unloading of tank cars at consignee premises, then other agencies could get involved. There would be contradictory law. And the agency said, and I quote, this commenter appears to misunderstand the implications of the NPRM, the proposed rulemaking proposal concerning tank car unloading. Other aspects of the HMR continue to apply to a rail tank car. For example, HMR requirements applicable to rail tank car construction, inspection, and maintenance continue to apply to a rail tank car even if the unloading operation involving such tank car is not subject to the HMR. So that goes right to your question. I believe it was Judge Smith. And you cannot increase the shipper's obligations as soon as the car is delivered to the property of the consignee. That would eviscerate one of the central points of the HMTA, which is consistency. Otherwise, you would have a situation where Pennsylvania law would impose requirements in addition to those imposed by the agency, the Department of Transportation. Rail cars carrying hazardous products in Pennsylvania would have additional requirements, which would be a separate regulatory scheme. And of course, one of the principles that this court has recognized in the Jersey City case is that you don't want a patchwork of different regulations in different states. Did you have a question, Judge Smith? I didn't. Well, I was simply going to respond that my question to Mr. Evans was led to a response that still suggests to me that plaintiff's position is that the regulations have certain requirements for design and manufacture of safety aspects of the tank car that apply to when it is actually in transport, but that at some point in time and space, when it reaches a siding, when it reaches a manufacturer, all of a sudden what is acceptable under those regulations is no longer acceptable, according to their theory. Additional safety devices would be required. Does that sound right to you? No, it does not, Your Honor. And I will mention that actually the 61906 regulation did not go into effect on October 1st, 2004. And this is going to take a few minutes to walk you through. And we just figured this out a few days ago after receiving the court's letter. But actually, there were additional orders on May 28th. 61906, in its import, is that unloading by a consignee's employee is excluded from transport. Is that right? It is excluded from the hazardous materials regulations. Right. But that's the unloading activity. Of course, in this case, plaintiff's claims are based only on the equipment on the rail car. But the plaintiff was involved in an unloading activity, wasn't he? Well, actually, Judge, in his deposition, I believe it was at page 24, he testified that he was unscrewing an elbow valve that belonged to his employer. But all that's related to unloading, isn't it? He was taking sulfuric acid out of a tent car, and he was about to use a hose to affect that. In other words, he was unloading a tent car. I mean, isn't that what he was doing? Well, I suppose you could... Isn't that what he was told to do? He was told to unscrew the valve. They had decided that they were not going to unload that car any further. And that was the testimony of Mr. Roth and his supervisor, Mr. Martin. I don't think it's material. Well, yeah, let's just assume that that's what he was doing. Assume he was unloading. It doesn't really matter, because there are challenges to the equipment on the tent car, which the 61906 order at 61918, and also various other pages, the order is very clear that the cars remain regulated. And everything relating to the construction and equipment on the cars remain regulated. And that is the touchstone for preemption. Judge Reber has a question. You told us that actually the date that was given for the effective date is wrong, and it was a complex matter. And I don't know, is that in the papers before us? It is here at Judge. And what's the correct date? The correct date was June 1st, 2005. And the language was changed, because there were further proceedings. So that appears. I don't have the other slide, but you're welcome to look. Ms. Borenstein, yes, could you and counsel submit simultaneous letters about the date of the effective of 61906? We certainly will, Judge. Okay, within, it shouldn't take you very long, within five days. Absolutely. After today's date. Simultaneous submission, one letter. Thank you. Yes. And I can give you- One letter, I should have said one page. I don't know if it'll be one page. There are actually three- One letter, one page. There are actually three additional sites that the court would need. So it may take a little more than a page. But it was ultimately effective on June 1st, 2005, and the language was changed. And the language then changed the definition of unloading incidental to transportation. So it is not the same as the 61906. Does the change material, do you think, to this case? I do not think, with all due respect, Your Honor, that 61906 is material to this case. The whole thing isn't material. That's correct. I just wondered, counsel thinks maybe it is. If it was material, would the change make any difference? It might clarify for the judge, or for the court, where the line is drawn that Judge Smith asked about, because it changed the definition of unloading incidental to movement to be based on whether the carrier was still present and the carrier was involved in the unloading. It said, it now says that the HMR does not apply to unloading if the carrier is not involved. Well, it might be, that is, 61906 might be helpful, indeed might even be material, to the extent that Mr. Evans is suggesting to us, has suggested here in oral argument, I don't remember it from the brief, but is clearly telling us that the earlier iteration of the regulation was not reasonable for Chevron purposes or for purposes of endeavor, efforts. I don't think you could say it was not reasonable. I understand that. I'm suggesting that if you are pursuing that argument that he is making, then it may be at least useful to look at what is said in 61906 for purposes of determining reasonable misdemeanors. I think that's right. And I think the court would then want to look at 61906 and also page 61916 and 61918, which all have further explanation. For example, plaintiffs are suggesting or have suggested that the HMR was intended as a minimum, that is, that rail cars had to carry the valves that they already carried and that they did carry and that rail cars could comply with the HMR, but still further greater safety devices could be required of shippers and manufacturers. And that is expressly refuted in a later part of the same rulemaking procedure, which is, I believe, 61916, where it says that it is not a minimum. It says, yes, this is at page, pardon me, 61912-3, the Department of Transportation said the HMR are not minimum requirements that other jurisdictions may exceed if local conditions warrant. Rather, the HMR are national standards and must be uniformly applied across jurisdictional lines. Excuse me. So that's where the agency was coming from. This change was actually intended to reduce costs for confinees taking delivery, figuring that the confinees would have their procedures for unloading at their plants, et cetera. And of course, an employee of the confinee, in this case, Mr. Roth was the employee of Glatzelter, the company, he's covered by Workman's Comp. So the reason for this case is to try to supplement that, obviously. And were any of the concerns in animating 61906 in the agency's action so that some administrative responsibility would be shifted, perhaps to OSHA, with respect to oversight of what occurs at the confinees' site? That's correct. And that's stated at pages 61917, I think, 8 and 9. They specifically say that OSHA requirements will still apply. And this Court has said very clearly that the Hazardous Material Transportation Act is intended to get away from this patchwork. I mean, you can't – the Ninth Circuit set it in Quarren Institute. This circuit set it in Jersey City. There are lots of cases. You don't want states to have separate regulations for what can be on cars. And of course, my client had a car – they sent the sulfuric acid in a car that was approved, one of the named cars in the agency's regulations. They weren't – it was a leased car. They were not present, but it was approved. It was properly constructed and maintained. Plaintiffs don't dispute that. I asked Mr. Evans or made a point that even if his client's conduct was excluded from the definition of transport, his claim would still be requiring a new design on the cars or the addition of pressure valve, safety valve, and pressure gauges. That's correct. His point was that the regulations do not specify the time. Could you respond to that? The regulations say that you have to get cars approved by the American Association of Railroads, which is appointed by the Department of Transportation. Plaintiffs have not pointed out – you know, there are nine cars listed. We've got an exhibit showing the nine cars and the certificate for the cars that we use. Plaintiffs' counsel has not pointed out to us a particular car that has the valve and the gauge that plaintiffs are seeking. So as far as we know, we're not aware of a car that has that equipment on it that could be used in transport under the HMTA. So what you would have to – As a practical matter, since railroad cars go all over the country, you have to change them all. In other words, it's not like you're building a building and one state has earthquake requirements and another doesn't because it's more of an earthquake zone. So that can be different. But a railroad car keeps moving. That's correct. And of course, it's Congress's responsibility to allow interstate commerce to be efficient and safe. Okay. Before I finish up. Oh, I'm so sorry. We believe that North Salco carried out all of its duties by sending its sulfuric acid in approved cars, and we think that this report should be accepted. Thank you, Ms. Poinsettia. Mr. Evans? You know, that was a question I asked your opponent, Counselor, and I wondered, if we hold that you're right in this matter, as a practical matter, the railroad cars of this kind would have to be modified throughout the entire country because railroad cars don't stay in one state. That's the nature of it. It's not like building a building where you have separate building requirements. What do you say about that? Pennsylvania, in effect, could push its regulations throughout the entire country. Your Honor, I wanted the court to know that valves are used, and it's clear in the record that valves are used on rail cars on the liquid lines. And what's the point? The point is that this is not, that it's a permitted use that it does happen. The North Falco, in this case, decided not to put it on the liquid line. Their own expert, Judge, when I asked him, would it be possible in the technology is not an issue in this case, is it? But it's also approved by the AAR. It also has been approved by the AAR, those regulations. And I'm not sure you ever answered my question. The question I had was, if we uphold this and say, yeah, you can get to a jury with this, then I suppose they would have to modify the railroad cars all over the country. North Falco would, Your Honor, yes. But not other manufacturers who are using valves on the liquid lines for this class of cars. But they would have to modify it all over the country, even though it was already approved by the AAR. North Falco, well, when it says approved, Your Honor, I'd like to read the regulation to the court that talks about the valves on this particular type of car. And it says, when the characteristics of the commodity for which the car is authorized are such that the devices must be equipped with a valve, then it must be approved valve. When the characteristics of the commodity are authorized, it doesn't say that, Judge, anywhere. That's left to the shipper to determine. It doesn't say anywhere in the hazardous material regulations that this particular class of car needs to have a valve on the liquid line. The AAR specifically calls for a type of valve. And that's what the plaintiff has submitted all along. We concede the type of valve. Use the approved valve. But the regulations don't discuss when it's supposed to be used. And that's left to the shipper. I bought an artificial log. And I happened to be reading it the other day. And I noticed that it had California warning. That it warned, in accordance with California law, certain risks. And I wondered, gee, I wonder if those risks exist in New Jersey. You know, if you light up the law. I'll tell you the truth. I live in a family now. But there's a part of the matter. I mean, there's something you just couldn't. Your Honor, that's directly on point with what Hawkins said. Hawkins, in the Third Circuit, the court said child warnings are governed by that regulation. But adult warnings aren't. And when adult warnings aren't, that's when the states have to come in. Mr. Evans, could I take you back to the plain language of the statute? Which is that HMTA preempts non-federal regulations. Which is what you would be proposing here through the adoption of a common law theory. It preempts that sort of regulation or law that is not substantively the same as the requirements that are set forth in federal law and regulation. How is your proposal substantively the same as? What appears in the federal regime? Okay. Substantively the same in the definition. Every conforms in every significant respect to the federal requirements. Are the valve that we claim NorFalco should have on these cars would conform in every respect to the federal requirements. It would be the approved valve of the AAR. But it's not required except in your circumstances. In other words, you have no problem with the AAR's statement that pressure gauges and safety valves are not required. Overall, you have no problem with that. Is that right? Could you repeat that? That these transport cars are not required to have pressure gauges and safety valves. It's up to the AAR's guidance. Yes, it is up to the... But you must have them in the circumstances in which your client was unloading the car. That be accurate? No, Your Honor. I think when they're... How would you support your claim for design defect unless those items were included in the car? It is a duty that is not governed by the hazardous material regulations, Your Honor. So it would be the duty of the shipper. Mr. Evans, thank you very much. Okay, we're going to take a five-minute recess. We'll be right back. Good morning, Your Honor. May it please the court, I'd ask for two minutes for rebuttal. My name is Albert Evans and I represent David Roth, the appellant in this matter. The court on March 17th asked two questions to be addressed here. The first question was, what was the Department of Transportation's working understanding of the phrase unloading incidental to movement prior to its final rulemaking on October of 2003? And judges, the DOT defined rulemaking... or defined unloading incidental to movement prior to October of 2003 to include any type of unloading, even unloading by a consignee multiple days after a railcar had been delivered to the consignee's facility and was on its private property. So does that mean we have a significant change in the import of the regulations pre-2004 amendments and post-2004 amendments? Your Honor, the answer is it was couched in terms of clarification on multiple... What was it? On multiple notices of proposed rulemaking. I mean, my recollection was that the DOT acknowledged at one point in the regulation that this constituted, quote, a significant change from current policy. Your Honor, I... How can a significant change be a matter of clarification? When the... Your Honor, when I read this is the final rulemaking dated October 30th of 2003, it says the RSPA is clarifying the applicability of the hazardous material regulations to certain functions, including unloading. I agree with the court, Judge Smith. It was a change. It was a significant... It was a change that took out from the regulations the unloading by a consignee after the carrier had left the premises. It took that out of the coverage of the hazardous material regulations and the Hazardous Material Transportation Act. That rule did. But how realistic is it to assume that you can separate from the design requirements of these regulations, transport from what then goes on at a siding? Don't those design regulations continue in effect and their import remain? Your Honor, can we artificially... That's a loaded question. But it seems to me we artificially attempt to separate the time and space of transport from the time and space of this tank car sitting on a siding or at a place of manufacture where it's unloaded. Your Honor, to address that question, though, we have to look at what the preemption section says of the Hazardous Material Transportation Act. And it says the design related in the transportation... This is what was in effect at the time of the injury of Mr. Ross now. Your Honor, I contend to the court that the court should take the definition that was enacted as the rule, the final rule on October 30, 2003, because the court, as a final interpreter of the language, needs to only give deference to the DOT definition if it is reasonable, Your Honor. And I believe that the DOT final rulemaking in October 30, 2003, 10 months before Mr. Ross' tragic incident, specifically went into three definitive reasons as to why their prior definition of unloading incidental movement, which was effective on Mr. Ross' day of the accident, was unreasonable. They clearly said in that final rule, 10 months before, the prior definition, even though not effective right away, is unreasonable. And they actually... They used the word unreasonable? Your Honor, they went... I submit to the court... They used the word unreasonable? No, they didn't, Your Honor. But they said for three specific reasons. And the first reason, Judge, was that the old definition ignored the realities of modern-day shipping. It said ignored the realities of modern-day shipping. Do you have any textual source anywhere criticizing the rule that would be suggestive of unreasonableness based on how the rule read at the time of the accident? Because your argument seems to be that the fact of amendment, the fact of change, suggests prior unreasonableness. No, no, Your Honor. My argument, Your Honor, is that when you look at the proposed notice of rulemaking, Your Honor, the notices leading up to the final rule, each one of them, Your Honor, by... specifically identified major or significant problems with the old definition or the definition in effect. Specifically saying at one point, Judge, that it was contrary to congressional intent. If a rule is contrary to congressional intent and stated by the DOT to be contrary to congressional intent, I believe that this court can make the judgment that a rule that is contrary to congressional intent is unreasonable. It gave... The entire rule or some portion of it, what was contrary to congressional intent? Contrary to congressional intent was the fact that the unloading... Congress said that it has to be unloading incidental to movement to be governed by the hazardous material regulations. And what the DOT said is by us creating a definition, the DOT, that unloading, every type of unloading, is subject to the regulation. Let me ask you... There's no... I'm sorry, Your Honor. Let me ask you a question. If we accept your position that your client's conduct is taken out of the regulations, what does that get you? You still have a product liability claim, don't you? I do, Your Honor. That is premised on a design defect? A design defect, yes, Your Honor. But as I said, the preemption clause, Your Honor... I understand that, but I want to get back around that. You're still arguing that there is a defect in this railroad tank car that involves the absence of a safety valve and a pressure gauge? Yes, specifically a valve, Your Honor. You still run into federal law that says that's not required? Your Honor, I respectfully contest a preemption. The preemption statute has to be interpreted narrowly, and it is only preempted if it's in transportation. In response to Judge Fuentes' question, you can see that that requirement is not in the regulation, right? Your Honor... Your entire theory of liability is based upon an additional safety mechanism? No, Your Honor. If you look at the regulation related to valves, Your Honor... Is it required? Or is what was on this tank car acceptable, explicitly so under the rules? It wasn't explicitly accepted, Your Honor, no. It was not an acceptable means under the regulations? It was approved by the AAR. However, Your Honor, the regulations under the hazardous material regulations do not govern when a valve should be used. It says under that specific section, 179-200-16, it says when circumstances warrant, a valve can be placed on the rail car of an approved nature. But to prevail in your case, you have to show that there was a deficiency, there was a defect in design in not including a safety valve in the tank car. But Your Honor... Which would be a requirement that is inconsistent with the AAR's requirements. No. Which is no safety gate. It wouldn't be consistent, Your Honor. It wouldn't be inconsistent. I'm sorry, it wouldn't be inconsistent, no. Because the regulations allow for a valve, the type of valve they specify, but they don't say when the valve could be used. They don't say in the regulations on a sulfuric, on Class 8 cars or sulfuric acid cars, this is when the valve would be on. If that was the case, Your Honor, I would concede it's preempted. But there's no condition, there's nothing in the hazardous material regulations that say when a valve is to be used. That is solely left within... Your case is premised on the idea that there should be a valve when it's not, when it doesn't come within the regulations. But you're still saying that there should have been a valve present in the tank car. Yes, Your Honor. And you're saying that's not inconsistent with the AAR's recommendation? The AAR is approving, their approval is based on the regulations, the transportation. They approve the car for its movement and transportation, not for its unloading purposes, Your Honor. And they permit valves, the AAR permits valves on the tank cars. They don't say when they permit, it's when it's left to the discretion of the shipper outside of the hazardous material regulations, outside of what the AAR does. The shipper has a duty to its customers outside of this, outside of the hazardous material regulations to protect its customers that it's providing hazardous material to. Look, if this is true, then it's because state law requires it. And while federal law might permit it, it didn't require it. I mean, there's a distinction between permitting something and requiring it. So, I mean, if in fact you can be hit with tort liability, then it's required, obviously. So, the outcome of litigation like this could require the changing of all these cars. I wonder, too, how long it has to sit there before it's no longer unloading. Now, suppose a train pulls up, there's an engine that pulls the train up, and the cars, even some guys rush over and start to unload it. Well, most people would say that's unloading, you could actually have a chance for patient. How about one day, two days, three days, four days? Your Honor, the DOT addressed that in its rulemaking process. And it said, Your Honor, when the carrier, the rail company that drops off the container is still present, that is considered unloading. In this case, Your Honor, the rail car was at the Constantine's facility for an indeterminate amount of time, but definitely for at least a week or more than a week. It would only have to be there for a couple of minutes, then. It would only have to be there for a couple of minutes if it took off. If the carrier left, yes, Your Honor, under the hazardous material regulations, the way the DOT's final rule was in October of 2003, then it would not be governed by the hazardous material regulations. If the carrier left the facility, yes. Just to make explicit what I assume is an understanding here, and that is the 5125, the section 5125 provision that refers to a package container or packaging component. There's no dispute that the railway tank car here was such a package container or packaging component, right? We allege that it was a packaging. It was the package that was distributed to Mr. Roth and his employer. Yes, Your Honor. We do. Is it the case that when there's a federal requirement, a federal regulation specifying for the provision of a safety device or no safety device, that the regulation should say when? Your Honor, the preemption law, both based on Medtronix and Harkins within this Third Circuit, specifically said that if they don't say when, it's not preempted. Your Honor, if we remember in Harkins, it was the children's warnings. Because the allegations were adult warnings, not children's warnings, it was not preempted. In Medtronix, it was a pacemaker. Because the pacemaker did not specify the form, it was not preempted. In this case, what I said to you is they don't specify when the valve should be used. Thank you, Mr. Evans. We've got your argument. Thank you. Hear you back on rebuttal. Ms. Bornstein. Thank you, Your Honor. Good morning. My name is Deborah Bornstein. And I represent NorFalco, which is the defendant and antelee in this case. And I guess I would like to address the preemption issue first, and particularly the court's questions. Because I do need to point out a couple of things. One, 61906 is approximately 60 pages of a regulation. And we think that, of course, the court should give consideration to the agency's interpretation. But I think that all of that... Consideration of deference. From deference. It's not binding on the court, because this was a rulemaking procedure, rather than an adjudicatory procedure. But certainly deference. And I think it's appropriate to read all of what the agency said. So later on, in the same order, in 61906, at page 61918, the agency is addressing comments that were made respecting the proposed rule. And there was a comment that if the HMR would not be applicable to unloading of tank cars at confining premises, then other agencies could get involved. There would be contradictory law. And the agency said, and I quote, this commenter appears to misunderstand the implications of the NPRM, the proposed rulemaking proposal concerning tank car unloading. Other aspects of the HMR continue to apply to a rail tank car. For example, HMR requirements applicable to rail tank car construction, inspection, and maintenance continue to apply to a rail tank car, even if the unloading operation involving such tank car is not subject to the HMR. So that goes right to your question. I believe it was Judge Smith. You cannot increase the shipper's obligations as soon as the car is delivered to the property of the consignee. That would eviscerate one of the central points of the HMTA. Which is consistency. Otherwise, you would have a situation where Pennsylvania law would impose requirements in addition to those imposed by the agency, the Department of Transportation. Rail cars carrying hazardous products in Pennsylvania would have additional requirements, which would be a separate regulatory scheme. And of course, one of the principles that this court has recognized in the Jersey City case is that you don't want a patchwork of different regulations in different states. Did you have a question, Judge Smith? I didn't. Well, I was simply going to respond that my question to Mr. Evans led to a response that still suggests to me that plaintiff's position is that the regulations have certain requirements for design and manufacture of safety aspects of the tank car that apply to when it is actually in transport, but that at some point in time and space, when it reaches a signing, when it reaches a manufacturer, all of a sudden, what is acceptable under those regulations is no longer acceptable, according to their theory. Additional safety devices would be required. Does that sound right to you? No, it does not, Your Honor. And I will mention that actually the 61906 regulation did not go into effect on October 1st, 2004. And this is going to take a few minutes to walk you through. And we just figured this out a few days ago after receiving the court's letter. But actually, there were additional orders on May 28th. 61906 in its import is that unloading by a consignee's employee is excluded from transport. Is that right? It is excluded from the hazardous materials regulations. Right. But that's the unloading activity. Of course, in this case, plaintiff's claims are based only on the equipment on the rail car. But the plaintiff was involved in an unloading activity, wasn't he? Well, actually, Judge, in his deposition, I believe it was at page 24, he testified that he was unscrewing an elbow valve that belonged to his employer. But all that's related to unloading, isn't it? It really is. He was taking sulfuric acid out of a tent car, and he was about to use a hose to affect that. In other words, he was unloading a tent car. I mean, isn't that what he was doing? Well, I suppose you could... Isn't that what he was told to do? He was told to unscrew the valve. They had decided that they were not going to unload that car any further. And that was the testimony of Mr. Roth and his supervisor, Mr. Martin. I don't think it's material. Well, yeah, let's just assume that that's what he was doing. Assume he was unloading. It doesn't really matter, because there are challenges to the equipment on the tent car, which the 61906 order at 61918, and also various other pages, the order is very clear that the cars remain regulated. And everything relating to the construction and equipment on the cars remain regulated. And that is the touchstone for preemption. Judge Reber has a question. You told us that actually the date that was given for the effective date is wrong, and it was a complex matter. And I don't know, is that in the papers before us? It is here, Judge. And what's the correct date? The correct date was June 1st, 2005. And the language was changed, because there were further proceedings. So that appears... I have notes on the document, though. Shall I continue? Ms. Borenstein, yes. Could you and counsel submit simultaneous letters about the date of the effectiveness of 61906? We certainly will, Judge. Okay. Within... It shouldn't take you very long. Within five days. Absolutely. After today's date. Simultaneous submission. One letter. Thank you. Yes. And I can give you... One letter. I should have said one page. I don't know if it'll be one... There are actually three... One letter, one page. There are actually three additional sites that the court would need. So it may take a little more than a page. But it was ultimately effective on June 1st, 2005, and the language was changed. And the language then changed the definition of unloading incidental to transportation. So it is not the same as the 61906. Does it change material, do you think, to this case? I do not think, with all due respect, Your Honor, that 61906 is material to this case. The whole thing isn't material. That's correct. I just wondered, counsel thinks maybe it is. If it was material, would the change make any difference? It might clarify for the judge, or for the court, where the line is drawn that Judge Smith asked about. Because it changed the definition of unloading incidental to movement to be based on whether the carrier was still present and the carrier was involved in the unloading. And it said, it now says that the HMR does not apply to unloading if the carrier is not involved. Well, it might be, that is, 61906 might be helpful, indeed might even be material to the extent that Mr. Evans is suggesting to us, has suggested here in oral argument, I don't remember it from the brief, but is clearly telling us that the earlier iteration of the regulation was not reasonable for Chevron purposes or for purposes of any deference. I don't think you could say it was not reasonable. I understand that. I'm suggesting that if you are pursuing that argument that he is making, then it may be at least useful to look at what is said in 61906 for purposes of determining reasonableness or unreasonableness. I think that's right. And I think the court would then want to look at 61906 and also page 61916 and 61918, which all have further explanation. For example, plaintiffs are suggesting or have suggested that the HMR was intended as a minimum, that is, that railcars had to carry the valves that they already carried and that they further greater safety devices could be required of shippers and manufacturers. And that is expressly refuted in a later part of the same rulemaking procedure, which is, I that it is not a minimum. It says, yes, this is at page, pardon me, 61912-3, the Department of Transportation said the HMR are not minimum requirements that other jurisdictions may exceed if local conditions warrant. Rather, the HMR are national standards and must be uniformly applied across jurisdictional lines. Excuse me. So that's where the agency was coming from. This change was actually intended to reduce costs for consignees taking delivery, figuring that the consignees would have their procedures for unloading at their plants, etc. And of course, an employee of the consignee, in this case, Mr. Roth, was an employee of Glatzelter, the company. He's covered by workman's cost. So the reason for this case is to, you know, try to supplement that, obviously. Well, and were any of the concerns in 6, animating 61906 in the agency's action, so that some administrative responsibility would be shifted, perhaps to OSHA, with respect to oversight of what occurs at the consignee's site? That's correct. And that's stated at pages 61917, I think, 8 and 9. They specifically say that OSHA requirements will still apply. And this Court has said very clearly that the Hazardous Material Transportation Act is intended to get away from this patchwork. I mean, you can't, the Ninth Circuit set it in Quarren Institute. This circuit set it in Jersey City. There are lots of cases. You don't want states to have separate regulations for what can be on cars. And of course, my client had a car. They sent the sulfuric acid in a car that was approved, one of the named cars in the case. They weren't, it was a leased car. They were not present, but it was approved. It was properly constructed and maintained. Plaintiffs don't dispute that. I guess Mr. Evans made a point that even if his client's conduct was excluded from the definition of transport, his claim would still be requiring a new design on the cars, or the addition of pressure valve, safety valve, and pressure gauges. That's correct. His point was that the regulations do not specify the time. Could you respond to that? The regulations say that you have to get cars approved by the American Association of Railroads, which is appointed by the Department of Transportation. Plaintiffs have not pointed out, you know, there are nine cars listed. We've got an exhibit showing the nine cars and the certificate for the cars that we use. Plaintiff's counsel has not pointed out to us a particular car that has the valve and the gauge that plaintiffs are seeking. So, as far as we know, we're not aware of a car that has that equipment on it that could be used in transport under the HMTA. So, what you would have to- As a practical matter, since railroad cars go all over the country, you have to change them all. It's not like you're building a building and one state has earthquake requirements and another doesn't because it's more of an earthquake zone. So, that can be different. That's correct. But a railroad car keeps moving. That's correct. And, of course, it's Congress's responsibility to allow interstate commerce to be efficient and safe. I mean- One second, finish up. I'm so sorry. Um, we believe that North Saco carried out all its duties by sending its Sulfuric Acid in approved cars and we think that this report should be accepted. Thank you, Ms. Boyce. Mr. Evans? You know, that was a question I asked your opponent, counsel, and I wondered if we hold that you were right in this matter. As a practical matter, the railroad cars of this kind would have to be modified throughout the entire country because the railroad cars don't stay in one state. That's the nature of it. It's not like building a building where you have separate building requirements. What do you say about that? The Pennsylvanian, in effect, could push its regulations throughout the entire country. Your Honor, I wanted the court to know that valves are used, and it's clear in the record that valves are used on rail cars on the liquid lines. And what's the point? The point is that this is not- that it's a permitted use that it does happen. The North Falco, in this case, decided not to put it on the liquid line. Their own expert, Judge, when I asked him- What's possible in the technology is not an issue in this case, is it? But it's also approved by the AAR. It also has been approved by the AAR, those regulations. You know, I'm not sure you ever answered my question. The question I had was, if we uphold this and say, yeah, you can get to a jury with this, then I suppose they would have to modify the railroad cars all over the country. North Falco would, Your Honor, yes. But not other manufacturers who are using valves on the liquid lines for this class of cars. But they would have to modify it all over the country, even though it was already approved by the AAR. North Falco? Well, when it says approved, Your Honor, I'd like to read the regulation to the court that talks about the valves on this particular type of car. And it says, when the characteristics of the commodity for which the car is authorized are such that the devices must be equipped with a valve, then it must be approved valve. Okay? When the characteristics of the commodity are authorized, it doesn't say that, Judge, anywhere. That's left to the shipper to determine. It doesn't say anywhere in the hazardous material regulations that this particular class of car needs to have a valve on the liquid line. The AAR specifically calls for a type of valve. And that's what the plaintiff has submitted all along. We concede the type of valve. Use the approved valve. But the regulations don't discuss when it's supposed to be used. And that's left to the shipper. I bought an artificial log. And I happened to be reading it the other day. And I noticed that it had California warning. And it warns, in accordance with California law, certain risks. And I wondered, gee, I wonder if those risks exist in New Jersey. I don't know if you light up the log. To tell you the truth, I lit it up. I didn't know. But the point of that is something you just couldn't. Your Honor, that's directly on point with what Hawkins said. Hawkins, in the Third Circuit, the court said child warnings are governed by that regulation. But adult warnings aren't. And when adult warnings aren't, that's when the states have to come in. Mr. Evans, could I take you back to the plain language of the statute, which is that HMTA preempts non-federal regulations, which is what you would be proposing here through the adoption of a common law theory. It preempts that sort of regulation or law that is not substantively the same as the requirements that are set forth in federal law and regulation. How is your proposal substantively the same as what appears in the federal regime? Okay. Substantively same in the definition. Conforms in every significant respect to the federal requirements. The valve that we claim NorFalco should have on these cars would conform in every respect to the federal requirements. It would be the approved valve of the AAR. But it's not required except in your circumstance. In other words, you have no problem with the AAR's statement that pressure gauges and safety valves are not required. Overall, you have no problem with that. Is that right? Could you repeat that? That these transport cars are not required to have pressure gauges and safety valves. It's up to them. Under the AAR's guidance. Yes, it is up to the... But you must have them in the circumstances in which your client was unloading the car. Would that be accurate? No, Your Honor. I think when they're... How would you support your claim for design defect unless those items were included in the car? It is a duty that is not governed by the hazardous material regulations, Your Honor. So it would be the duty of the shipper. Okay. Mr. Evans, thank you very much. We're going to take a five-minute recess. We'll be right back.